CLYDE STEAMSHIP COMPANY, APPELLANT, VS. BURROWS & DANIEL, APPELLEES.

1. By the common-law rule common carriers are held to a very strict accountability for the loss of goods received for carriage, such accountability being independent of contract, and imposed by law on grounds of public policy and commercial necessity for the protection of the owner of the goods.

2. In the absence of a special contract restricting or modifying a common carrier's common-law liability in some particular which the courts may not consider unreasonable or subversive of public policy, such carrier is an insurer against all risks of loss or injury, except those resulting directly from the act of God or the public enemy and without the intervention of human agency while the carrier is in the line of duty.

3. The expression "perils of the sea" is not synonymous in legal signification with the terms "act of God," or "the public enemy." An act of God may include a peril of the sea, but there may be perils of the sea not embraced within the term "act of God."

4. Where the defense interposed by plea to a declaration against a common carrier for failure to safely transport and deliver goods received for shipment is that the goods were lost by an accident resulting from a peril of the sea, and issue is joined thereon, the case will be considered on the issue tendered and accepted.

5. A defense on the ground that a common carrier is exempt from its common-law liability under a contract of affreightment, must specially allege the contract of release, and the burden is upon the carrier to maintain such defense.

6. Where the testimony, without contradiction, sustains a plea setting up a defense upon which issue is joined, the finding of a referee contrary thereto will be reversed.

Appeal from the Circuit Court for Duval county.

### STATEMENT.

Appellees sued appellant and obtained judgment in July, 1891, and the case is before us on appeal from the judgment entered.

The declaration, in substance, alleged the steamship company to be a corporation existing under the laws of the State of New York, and a common carrier of goods and chattels for hire in navigating a line of steamships between the city of Jacksonville, Florida, and the city of New York, in the State of New York; that on the 4th day of March, 1890, plaintiffs at the request of defendant, caused to be shipped on the "Delaware," one of the vessels of defendant, thirteen hundred shad fish, of the value of $254, in good order and condition, properly packed in ice, to be taken care of and safely carried by defendant from the city of Jacksonville to New York, and there to be safely delivered in like good order and condition; that in consideration thereof, and of certain reward, defendant promised to take care of and safely carry and deliver said goods, and although it received the same to be carried and delivered as aforesaid, and although a reasonable time for the carrying and delivering of the same had long since elapsed, yet it did not and would not take care of and safely deliver the goods, though no dangers of navigation prevented it from so doing,

but took so little and such bad care of such goods whilst in its care and custody that by and through its negligence in not keeping said goods properly packed in ice, and its other negligence, the same were wholly lost to plaintiffs.

Defendant first filed two pleas—that it did not promise in the manner alleged, and that plaintiffs did not ship the goods mentioned on the " Delaware," or any other vessel of defendant.

The case was referred to a referee for trial, and at a subsequent date a special plea was filed, to which a demurrer was directed. The demurrer was sustained, and it appears that amended pleas were filed. No question is raised here as to the ruling on the demurrer to the special plea, and as it is made to appear that the only pleas relied on, and upon which issue was joined, were the amended pleas, we will refer only to them.

The first amended plea alleged that one of defendant's steamships received, on or about the 4th day of March, 1890, from a steamer plying the St. John's river, thirteen boxes of shad marked " Caleb Haley & Co., New York City," and sailed with the fish on board for New York, via Charleston, South Carolina; that the ship reached Charleston in due time, and upon arrival had the fish carefully and adequately reiced, and departed from said port on the 6th of March for New York; that the ship was seaworthy in all respects, had a competent master, sufficient crew, and was supplied with the best appliances for being properly navigated, and that the machinery and appliances were carefully tested before leaving port, and found in good condition; that when off the coast of North Carolina, while being properly navigated in the usual way, and without delay, the vessel encountered

a heavy northeast gale with a high and dangerous sea that loosened her rudder post at the bottom, rendering it impossible to navigate her, and that said accident was caused by the peril of the sea, and without negligence or lack of care and management on the part of defendant; that by reason of said casualty the ship was prevented from completing her voyage on schedule time, and was compelled to put into the small town of Southport, North Carolina, and procure the services of a diver to secure the rudder post with chains, and while in said port diligent effort was made to procure ice for the protection of the fish, but none could there be had; that the ship departed for New York on the 11th of March, 1890, under a convoy steamer, and the casualty mentioned was unavoidable, and caused an inevitable delay, by reason of which the fish spoiled and became unfit for use, and the decay was due to the intrinsic tendency of the fish to spoil, and not through any negligence of defendant. It was further alleged that the defendant was without sufficient quantity of ice for preserving fish for such an unusual and unforeseen delay, and could not procure it, and that the fish became unfit for use, offensive, and dangerous to the health of the passengers, and had to be thrown overboard.

The second plea alleged that the fish were perishable property, carried at the owners' risk of damage arising from natural causes, and that they decayed and spoiled by reason of the inherent quality of the same, which was a natural cause, by reason of which and inherent defects they became a total loss.

Plaintiffs joined issue on the foregoing pleas, and the trial was had thereon.

The other facts necessary to be stated will appear in the opinion.

*John E. Hartridge*, for Appellant.

The only exceptions that appellee takes to the state-ment of facts made in appellant's brief is, that it is not admitted that the ship was in all respects sea-worthy and that no negligence can be imputed to ap-pellant.

Whether admitted or not, the evidence of the cap-tain of the ship, and of the mate of the ship, shows that she was in all respects sea-worthy and in good con-dition when she left port, suitable for the traffic in which she was engaged, and that a careful examina-tion had been made of her steering gear before pro-ceeding to sea. Against this testimony not one sylla-ble is offered by appellee. Hence it follows, as a mat-ter of conclusion of fact, that she was sea-worthy, and that no negligence could be imputed to appellant, and that the vessel was properly manned and fit for the bus-iness in which she was engaged.

The objection under the second head, that the as-signment of error upon the part of appellant does not follow the language of the referee, is without import, since it was the object of appellant to epitomize the wording of the referee and thereby avoid prolixity of verbal statement.

The appellee cites the opinion of Justice Gray in the case of Liverpool & Great Western Steamship Com-pany vs. Phœnix Insurance Company, U. S. Rep. 436. We have no dispute with the doctrine laid down by this suit. It supports contention of appellant. We claim, as we will show later on by additional author-ities, that we are within the limitations regardless of whether a bill of laiding was signed or not.

Appellee's only criticism upon the authorities cited by appellant to show that "Perils of the Sea" are

within the inhibition of exemption of liability regard less of the signing of a bill of lading is, that Wheeler in his work on Modern Law of Common Carriers goes too far, and he cites another section of Wheeler to support this contention. The section of Wheeler cited by appellee is in perfect harmony with that cited by appellant. The two are in no way in conflict.

The opinion of Justice Bradley in the New York Railroad Company vs. Lockwood, 17th Wallace, 373, expounds the doctrine with which we have no quarrel. That case simply states that a carrier can not exempt itself from a liability that is not just and reasonable in the eye of the law, and that it can not save itself by contract from responsibility from its own negligence.

Neither of these principles apply in the case at bar. The exemption in the first place claimed is recognized independent of contract and is a reasonable one. In the second instance, it is not seeking an exemption from any negligence, since there is no evidence to show that any negligence can be imputed to appellant.

In regard to the doctrine cited from Wheeler, and also in the case of the New Jersey Steam Navigation Company vs. Merchants Bank, 6th Howard, 244, we do not dispute the principle announced, but claim that it has no application to the case under discussion.

Here we are standing on our common law rights, that we are exempt from liability from "Perils of the Sea." It is a matter of law and not a matter of contract. If we had a contract in writing, naming certain causes which would exempt us from liability, then of course it would have been our duty to show them and the principle would apply. But where, as in this case, we are standing simply upon our rights under the law, it is only necessary that we prove that the damage came within

the limitation fixed by law. This we claim to have shown.

So the case of the Michigan Central Railroad Company vs. Mineral Springs Manufacturing Company, 16th Wallace, 330, is upon a state of facts and announces a principle in no way applicable to this case.

The citation from Hutchinson on page eight (8) of appellee's brief is where a person was held under a contract on the principle that he could not exempt himself from his own negligence. We make no such claim in this case, and have never done so.

The case cited of the Germania Insurance Company vs. Lady Pike, on page eight (8) of his brief, announces the doctrine that a carrier can not excuse itself from liability for destruction occasioned by incompetency and unskillfulness of the master. No such question arises here. There is not a scintilla of proof that there was any incompetency or unskillfulness upon the part of any of the officers of the ship.

Further on appellee re-states the different cases cited by appellants, but in no way, according to our notion, shows that they are not applicable and do not control in the case at bar.

The case cited from 18th Federal Reporter in which Chancellor Kent is quoted, approvingly, as to latent defects, that principle has no application here, since it is not shown that there was any defect either latent or patent. It is shown that as far as human agency could discover there was no defect of any kind or character, and that the injury came from the violence of the sea.

The case quoted from 6th Federal Reporter, 148, with so much satisfaction upon the part of appellee, being the opinion of Judge Pardee, has no application whatsoever to the case at bar. We have read this case,

and the question involved there was whether the goods had been properly stowed. This is a case where the shipment consisted of iron rails, and they were stowed locked together in such a way that they increased the labor and strain of the vessel and because of this improper stowage the ship was held liable.

So the case in 19th Federal Reporter cited by appellee, was from improper stowage.

The case in 19th Federal Reporter, 875, and 25th Federal Reporter, 562, is a case where the shipment was frozen by reason of its landing. The court held the carrier liable, not because of this fact but because the goods were landed at a time when they were liable to freeze and against the consent of the consignee, who wished them held. The carrier was considered negligent in doing an act that led to this injury.

The Samuel Springs, 29th Federal Reporter, 373, was where the ship leaked. This is prima facie evidence that she was not sea-worthy.

The Brantfoot City, 29th Federal Reporter, 373, was where a ship was held liable because of improper stowage.

This is in brief the contention of appellee.

All that appellee has stated in regard to the principle of law of exemption from liability for an "Act of God," regardless of a bill of lading being signed, is to the effect that it does not include "Perils of the Sea." Wheeler on Modern Carriers, as stated in appellant's brief, lays it down positively that it does include "Perils of the Sea." To the same effect is Hutchinson on Carriers, section 176.

It is further laid down by Hutchinson on Carriers, section 216a, that a carrier can not be held liable for losses which have been caused by the inherent

nature of infirmity of the goods themselves, as in the case of decay. This was a shipment of fish, and inherently possessed the elements of its own destruction.

On the other point submitted by the appellant, viz., that there was but one rate for the shipment of fish, and that a released rate, the evidence here shows that the shipper had been accustomed to sending fish in this way, and under the law would be presumed to have had notice.

We contend, however, that under the facts stated, there being but one rate, and that a released rate, it being impossible to ship in any other way, it would not make any difference whether the shipper did or did not have notice. The only object in a person having notice is to affect his status. In this instance shipper's status could not possibly have been affected by notice, since the shipment would not have gone any other way. Notice would not have served to change his attitude or that of the carrier, in regard to the shipment. There was but ono way of shipment, and it went that way.

It was proper that the testimony of those experienced in the business and the rates of the Interstate Commerce Commission and the State Railroad Commission, showing only a released rate for this character of shipment, should have been introduced in evidence.

As early as Pickering vs. Barclay, decided in the latter part of the reign of Charles I, quoted in 2d Rall. Abr., 248, it was allowed to show that usage of the trade in regard to exemption under a bill of lading. Numerous cases have followed this principle. For the exception "Perils of the Sea" and what it

means, we cite to the court Chapter 18, page 266, Porter on Law of Bills of Lading.

Only one other contention made by appellee. It is contended that the accident occurred on March 7th, and the fish were not destroyed until March 11th, and that we could have easily procured ice from Wilmington, North Carolina.

The delay in the decay of these fish was due to the fact that they had been carefully re-iced at Charleston, South Carolina, as the evidence shows; and to the further fact that the ice that chanced to be on board the ship enabled them to preserve the fish showing extraordinary diligence and effort on the part of the carrier to preserve the shipment of fish. Effort was made at Southport to get ice. It is shown that there was no sure or certain means of communication with Wilmington. Independent of this, the ship had made an effort to get to sea early after the accident, and had this effort succeeded, as they had the right to believe it would, they could possibly gotton the fish into port without harm.

Taking all the facts into consideration we again submit that the case should be reversed, and that under the facts there should be no recovery.

*Call* and *Adams*, for Appellees.

MABRY, C. J.:

There is very little disagreement about the facts of this case. That the steamship company is a common carrier, and received the fish in good condition, properly packed in ice, for transmission to New York, is not questioned on the record. It is conceded further that the shipment of the fish was without any bill of

lading, and there was no special contract in writing fixing or limiting the liability of the company in reference thereto.

It is insisted by counsel for appellant that the referee erred in holding, on the facts of the case, that the company was not released from liability for the loss of the fish resulting from decay, and this contention is based upon two theories. The first is, that the fish perished, without fault on the part of defendant, from inherent natural causes, for which the company was not liable; and the second is, that plaintiffs knew when the fish were shipped that they were to go as released goods, and that the company did not take such goods under any other conditions than that they should be released. Passing for the present the contention stated, we will first refer to the issues upon which the case was tried.

The declaration alleges that the defendant company did not take care of and safely deliver the fish, though no dangers of navigation prevented, but took so little and such bad care of them that by its negligence in not keeping them properly iced, and other negligence, they became wholly lost to the plaintiffs. The plea, the substance of which we have set out in the statement, is voluminous for law pleading, but it sets up the defense that the fish perished from inherent defects in consequence of an unavoidable delay caused without fault on the part of defendant by the vessel encountering a heavy north-east gale with a high and dangerous sea that loosened her rudder post at the bottom, rendering her navigation impossible, and that the accident to the vessel was caused by a peril of the sea. It is also alleged that the ship was without ice sufficient to preserve the fish until the end of the voyage, and that none could be procured

in the port where she was detained in consequence of the delay.   By the rule of the common law common carriers are held to a very high and strict liability for the loss of goods received for carriage.   In Packard vs. Taylor, 35 Ark. 402, S. C. 37 Am. Rep. 37, the rule is stated as follows, *viz :*  "The carrier's obligation to keep and carry safely is founded on the custom of the realm, at common law; and is independent of contract, being imposed by law for the protection of the owner, and founded upon public policy and commercial necessity.   (Chitty on Carriers, 34, 35).   There may be a special contract, also, not indeed superseding that implied by law, which still underlies the other, but restricting or modifying it in some particular, in a manner which the courts may not consider unreasonable, or subversive of the general policy.   But in the absence of any such contract, the carrier is an insurer— liable not only for negligence, but even for inevitable accident, not occasioned by act of God."   In that case there was no question of public enemies.   At common law the carrier's liability transcends all questions of care and diligence, and he is virtually an insurer against all risks of loss or injury save those resulting directly from the act of God or the public enemy and without the intervention of human agency.   This is the rule as established by authority.   Friends vs. Woods, 6 Grattan 189, S. C. 52 Am. Dec. 119; Maslin vs. Baltimore & Ohio R. R. Co., 14 W. Va. 180, S. C. 35 Am. Rep. 748; Liverpool & Great Western Steam Co. vs. Phœnix Insurance Co., 129 U. S. 397; Gleeson vs. Virginia Midland R. R. Co., 140 U. S. 435; Norris vs. Savannah, Florida & Western Ry. Co., 23 Fla. 182, 1 South. Rep. 475; Alabama Great Southern R. R. Co. vs. Little, 71 Ala. 611; Hutchinson on Carriers, section 174 *et seq.;* Coggs vs. Bernard, 1 Smith's Leading

Cases, 354 and notes, S. C. Ld. Raymond 909. When the carrier is in the line of his duty, and the loss or injury to goods in his custody for carriage is solely attributed to the act of God or the public enemy, it is matter of defense to be pleaded and established by proof.

The authorities are not entirely harmonious as to what causes of a natural and unexpected character are to be embraced within the exemption of the liability stated, and, on the issues in the present case, we do not deem it necessary to go into a general discussion of this subject. The plea alleges that the ship in question was disabled by a heavy northeast gale with a high and dangerous sea, which was a peril of the sea. Issue was joined on the plea, and the referee found distinctly that the accident to the vessel was not caused by a peril of the sea. If the testimony shows clearly without contradiction that the detention of the vessel was caused by a peril of the sea, and defendant was without fault in any respect, the finding should have been in its favor, without reference to whether or not the peril of the sea causing the accident was an act of God. The plea does not allege in terms that the accident to the vessel was caused by an act of God, but it is alleged to be a peril of the sea. The terms are not, in our judgment, synonymous. Plaisted vs. Boston & Kennebec Steam Navigation Co., 27 Maine 132, S. C. 46 Am. Dec. 587; Central Line of Boats vs. Lowe, 50 Ga. 509. In referring to the expression "act of God," Wheeler on Modern Carriers, page 296, says: "There are other terms, such as perils of the seas, lakes, rivers and navigation and inevitable accident, frequently found in bills of lading, and used to express various causes of loss and injury, from responsibility for which the carrier is exempted, either by the oper-

ation of law, or the express terms of the contract. In such cases the rule is the same." This author further states that the terms referred to are frequently used as synonymous with the "act of God," but not always. so. In cases of special contracts permitted by law they, of course, would control, but in the absence of such contracts the terms are not, in our judgment, synonymous. An act of God may include a peril of the sea, but there may be perils of the sea that are not embraced in the terms "act of God," and against which the carrier can only escape liability by such special contract as the law permits. For comment on the case of Colt vs. McMechen, 6 Johnson 150, S. C. 5 Am. Dec. 200, see Hutchinson on Carriers, section 178. So we need not decide on this appeal whether the cause of the accident to the vessel in question was the "act of God," as the issue tendered by the plea and accepted by plaintiffs was whether the accident resulted from a peril of the sea. Nor are we at liberty to disregard the plea on the ground that it is insufficient to present a proper defense for the defendant, as it was not objected to by demurrer, and the trial was had on the issue tendered by it. Mudge vs. Treat, 57 Ala. 1; Jones vs. Collins, 80 Ala. 108. We think the testimony in the record without any contradiction shows that the defendant was without fault. After the accident happened it is shown that no ice could be had to save the fish, and that they spoiled in consequence of the melting of the ice in which they were packed. It was also shown that the vessel was in good condition, properly equipped for the usual hazards of the voyage, and skillfully navigated, and that her rudder post was knocked out of its position by a very severe and unusual northeast gale with high and dangerous seas. That the cause of the accident was a peril of the sea,

we have no doubt, and as there is no conflict in the evidence on this point, the finding of the referee can not be sustained. This conclusion disposes of the appeal, and if the case is to stand upon the issues made, nothing further need be said in reference to the other contention, but it may not be amiss to say that we do not consider that there is any sufficient plea setting up the defense that the fish were shipped as released goods. The burden is upon the carrier to set up and maintain such a defense. Railroad Co. vs. Manufacturing Co., 16 Wall. 318.

The second plea sets up only that the fish were carried at owner's risk of damage arising from natural causes, and that they perished from such causes. This is not alleging a special contract of release from common law liability, or duty arising under the contract of affreightment. At common law the carrier was not liable under the exceptions above mentioned when the loss arose from the nature and inherent character of the property carried, such as the natural decay of perishable articles, when handled with care and transported in proper time. Maslin vs. Baltimore & Ohio R. R. Co. *supra*. On the evidence before us, independent of any other ground of defense, or exemption of liability, we would not be disposed to disturb the finding on the ground that the loss of the fish was not caused by inherent natural causes. That fish are liable to natural decay by reason of inherent causes is evident, but the undisputed evidence before us is that when properly iced they will keep at least two weeks, and further, that the usual time for the defendant's steamers to go from Jacksonville to New York was from four to five days. The vessel could not, of course, without legal excuse, delay the voyage until the fish

spoiled, and set up their perishable nature as a defense.

The judgment of the court below is reversed.